IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA        )
                                )
        v.                      )  Criminal No. 06-350
                                )
KYLE ANDREW CARNEY              )


O P I N I O N

DIAMOND, D.J.

On October 10, 2006, the grand jury returned a one-count indictment against defendant Kyle Andrew Carney ("defendant") charging him with possession of material depicting the sexual exploitation of a minor, in violation of 18 U.S.C. §2252(a)(4)(B). Presently before the court is defendant's motion to suppress evidence and statements, in which he raised a number of grounds for suppression (Document No. 47)[1] (hereinafter, "Defendant's Motion"), as well as a motion to produce evidence which the government intends to use under Fed.R.Evid. 404(b) and 609 (Document No. 32). On March 13, 2007, the government filed its response to defendant's suppression motions (Document No. 34) (hereinafter, the "Government's Response"). Subsequently, on March 28, 2007, defendant filed a reply to the government's response (Document No. 36) (hereinafter, "Defendant's Reply"), in

_____

[1]Defendant's suppression motion originally was docketed as Document No. 31, but a redacted version of the motion subsequently was filed on May 21, 2007, and the redacted version is docketed as Document No. 47.

which he raised additional grounds for the suppression of evidence, including a motion to suppress under Franks v. Delaware, as well as a request for additional discovery and a motion to preclude the testimony and report of Dr. Christine Martone. A hearing on these matters was held on May 22 and May 23, 2007. For the reasons set forth herein, defendant's motion to suppress evidence and statements will be granted, defendant's discovery request will be denied, defendant's Franks motion will be denied, defendant's motion to preclude Dr. Martone's report will be granted, and defendant's motion under Rules 404(b) and 609 will be denied.

## I.  Factual Background

At the suppression hearing, Pennsylvania State Troopers Timothy Frew, Robert Erdely and Robert Valyo testified on behalf of the government. Defendant testified on his own behalf, and he also presented the testimony of his mother, Kathy Carney. The testimony at the hearing established the factual background which follows.

In late 2005 and early 2006, Pennsylvania State Trooper Robert Valyo and Trooper Timothy Frew investigated a series of arsons in Indiana County that included a commercial building fire in September 2005, a structure fire in December 2005 and a barn fire in January 2006. On January 2, 2006, Assistant Fire Chief

2

David Ling of the Armagh Volunteer Fire Department contacted Trooper Valyo to inform him that he had some concerns about the rapid response time of fireman Rick Nerone. According to Ling, given the location of Nerone's residence, Nerone had arrived suspiciously fast to fires on multiple occasions. With regard to the fire that occurred on January 2, 2006, Ling stated that Nerone did not go out on the call because he claimed to have injured his ankle at the fire hall while getting dressed. After he injured himself, Nerone contacted defendant, who was a friend of his, and defendant appeared at the fire hall to transport Nerone.

Trooper Frew testified that he received an anonymous telephone call at approximately 8:00 a.m. on January 4, 2006, from an unknown male caller. The anonymous caller stated that defendant was the person responsible for the recent fires in the Armagh area. According to Trooper Frew, the anonymous caller hung up before he could ask the person any questions.

After receiving the call, Troopers Frew and Valyo went to defendant's residence to interview him about his knowledge of the fires. When they arrived, Trooper Frew observed a computer in the foyer. He could see that the computer had been used for what appeared to be "instant messaging." Defendant's mother, Kathy Carney, was at the computer when the troopers arrived.

Mrs. Carney answered the door, the troopers stated their business and asked to speak to defendant. Mrs. Carney informed

3

the troopers that defendant was sleeping, but she went to retrieve him.   The troopers told defendant that they were investigating three arsons.   Defendant testified that the troopers told him he was not a suspect, but they wanted to know his whereabouts when the arsons occurred.   Defendant denied any involvement in the arsons.  Defendant volunteered that some people, in particular his ex-girlfriend, do not like him and might mention his name in connection with the arsons for that reason.   The troopers asked defendant if he would inform them if he obtained any information about anyone setting fires.   Defendant responded that he was depressed and did not know whether he would provide such information.

Both Trooper Frew and Trooper Valyo testified that defendant was forthcoming during the interview on January 4, 2006, he appeared to understand their questions and he answered them. Trooper Frew also testified that he was not aware during the January 4, 2006, interview that defendant took psychotropic medication.   Mrs. Carney testified that she told defendant in front of the troopers that he needed to take his medication, but she did not recall if she stated why defendant needed the medication.

Also on January 4, 2006, the troopers interviewed Rick Nerone and James Foster, who both implicated themselves in the arsons to a point, as well as mentioned defendant.

4

On January 10, 2006, Assistant Fire Chief Ling provided a packet of information to the troopers, including defendant's myspace.com posting from January 5, 2006, the day after he was interviewed by the troopers. A copy of defendant's myspace.com posting is attached to the Government's Response as Exhibit B, and it was admitted into evidence at the hearing as Government Exhibit 10. The title of the posting is "F*** the Police", and defendant recounted a number of details about his interview with the troopers. Defendant also claimed to know nothing about the fires.

Trooper Frew testified that he prepared an affidavit to obtain a search warrant to seize and search defendant's computer for communications between defendant, Nerone and Foster concerning the fires. Trooper Frew testified that he did not include in the warrant affidavit all of the information he knew concerning defendant's involvement in the fires. According to Trooper Frew, it was a tactical decision to draft the warrant affidavit as he had prepared it.

Trooper Frew presented the warrant affidavit to District Justice Jennifer J. Rega of Magisterial District 40-3-03 in Blairsville, Pennsylvania. On January 30, 2006, District Justice Rega issued a search warrant for defendant's residence. The warrant authorized the seizure of computer equipment. A copy of the search warrant and the affidavit in support of the warrant is attached to Defendant's Motion as Exhibit 1, and it was admitted

5

AO 72
(Rev. 8/82)

into evidence at the hearing as Government Exhibit 1.

The warrant was executed at defendant's residence on January 30, 2006, and various computer equipment was seized.   Defendant was not home when the warrant was executed, but the troopers asked his father to communicate their desire to talk with him about the arson investigation as soon as possible.   Defendant subsequently contacted the troopers to arrange an interview time for the next day, January 31, 2006.

Defendant testified that he took his psychotropic medication on the morning of January 31, 2006, before going to the interview. Defendant's parents drove him to the Indiana state trooper barracks early in the morning on January 31, 2006.   Troopers Frew and Valyo met with defendant in a conference room.   Both troopers testified that at the beginning of the interview, defendant was advised that he was not under arrest and he was not in custody, however Trooper Frew gave defendant a _Miranda_ warning.   Trooper Frew testified that he gave defendant a _Miranda_ warning even though he was not in custody just to advise defendant of his rights.   Trooper Frew read to defendant the Pennsylvania State Police Rights Warning and Waiver form, while defendant looked at a copy of the form.   The Rights Warning and Waiver form was admitted into evidence at the hearing as Government Exhibit 2. According to Trooper Frew, defendant did not show any hesitancy about executing the waiver, nor did he request counsel.   Trooper

6

AO 72
(Rev. 8/82)

Valyo also testified that defendant did not ask any questions about the form, nor did he ask for a lawyer. Defendant signed the waiver form, indicating that he understood his rights, that he did not want an attorney, and that he was willing to answer questions.

In connection with defendant's knowledge of the arsons, he executed the first noncustodial written statement at 8:10 a.m. A copy of that statement is attached to Defendant's Motion as Exhibit 3, and it was admitted into evidence at the hearing as Government Exhibit 3. The form on which defendant made the statement provides, "I am NOT detained, under arrest, or otherwise in custody. I fully understand that I am free to leave the officer's presence at any time. I have decided, of my own free will, and not due to any threats or promises made by the police, to answer questions concerning a crime under investigation." Defendant subsequently gave a second written statement regarding the September 9, 2005, arson. Defendant made his second written statement at 9:00 a.m. on a non-custodial written statement form after being advised that he was not in custody. Defendant's second non-custodial written statement form is attached to Defendant's Motion as Exhibit 4, and it was admitted into evidence at the hearing as Government Exhibit 4.

The interview then focused on the January 2, 2006, arson. The time was approaching 10:00 a.m., and Trooper Frew testified that he wanted to make sure defendant still was aware of his

7

Miranda rights because of the length of time of the interview. At that point, the troopers used the form for custodial statements, because, Trooper Frew testified, it contained a printed advice of Miranda rights. A copy of the custodial statement form which sets forth defendant's third written statement is attached to Defendant's Motion as Exhibit 5, and it was admitted into evidence at the hearing as Government Exhibit 5. Trooper Frew read defendant his Miranda rights as set forth on the form, and defendant initialed the form. According to Trooper Frew, defendant was advised that he still was not in custody. Both Troopers Frew and Valyo testified that defendant did not ask any questions concerning his rights. Defendant wrote a statement concerning his knowledge of the January 2, 2006 fire. In addition, defendant told the troopers that Rick Nerone had text-messaged him before he arrived at the barracks to instruct him how to conduct himself during the interview with law enforcement. Defendant allowed Trooper Valyo to copy the text messages he received from Nerone.

Also on January 31, 2006, while Troopers Frew and Valyo were interviewing defendant, Trooper Robert Erdely of the Pennsylvania State Police computer crimes unit began his forensic examination of defendant's computer. Trooper Erdely testified that he was not directed by Trooper Frew to perform his forensic examination on that date, but his examination took place the same day as

8

AO 72
(Rev. 8/82)

defendant's interview at the barracks by coincidence.   Trooper
Erdely had no involvement in the arson investigation and he had
not reviewed the search warrant.   Trooper Frew told Trooper Erdely
to search defendant's computer for myspace.com postings and e-
mails and instant messaging between defendant, Nerone and Foster.

At approximately 10:10 a.m., Trooper Erdely sought consent
from defendant to access his myspace.com account.   Private account
information is needed to access the full complement of public and
private myspace.com correspondence, which is why Trooper Erdely
sought defendant's consent to access his account.   Trooper Erdely
went to the conference room where defendant was being interviewed
to obtain his consent.   Trooper Erdely explained why he sought
defendant's consent and defendant executed a consent form, which
permitted Erdely to access his myspace.com account.   The consent
form executed by defendant to search his myspace.com account is
attached to the Government's Response as Exhibit D, and it was
admitted into evidence at the hearing as Government Exhibit 6.
After obtaining defendant's consent, Trooper Erdely left the
conference room, returned to his office and began the forensic
examination of defendant's computer.   Trooper Erdely testified
that there was nothing about defendant's demeanor that stood out
to him during their interaction.

To perform the examination of defendant's computer, Trooper
Erdely used "Encase", which is specialized software used in

9

forensic computer analysis.  Trooper Erdely previewed defendant's computer hard drive, "imaged" or copied it, and then viewed the imaged version on a forensic computer.  The manner in which Trooper Erdely utilized Encase to examine defendant's computer revealed thousands of "thumbnail" images, which Trooper Erdely scrolled through to review.[2]  While examining defendant's computer, Trooper Erdely recognized that one of the "thumbnail" images appeared to depict a minor female engaged in sexually explicit conduct.  Upon noticing that, Trooper Erdely stopped his forensic examination of defendant's computer.

Trooper Erdely then returned to the conference room a second time.  He showed Trooper Frew the picture of the minor female, who Frew recognized as defendant's girlfriend.  At that point, defendant, accompanied by Troopers Frew and Valyo, went to Trooper Erdely's office.  Trooper Erdely informed defendant that he had found an image of what appeared to be child pornography on his

---

[2]Defendant's counsel suggested in her cross-examination of Trooper Erdely at the hearing that, instead of simply viewing all images that were on defendant's computer, he could have generated a list of file names and then performed more specific text searches based on the names of those files and only then viewed image files if they were relevant to the arson investigation. Trooper Erdely testified on cross-examination that it would have been possible to perform a text search of defendant's computer files by using words associated with the arsons, instead of an image search; however, he also testified that text-searching is inefficient.  Trooper Erdely testified on re-direct examination that it was not his practice to first generate a list of file names contained on the computer because the names of the files could be misleading.

10

computer.  Trooper Erdely asked defendant if he had a 15-year-old girlfriend, and indicated that he thought he found a picture of her on defendant's computer.   Trooper Erdely explained to defendant that he would like to search defendant's computer for child pornography, and he sought defendant's consent to search for that purpose.  At 11:11 a.m., defendant executed a written consent to search form, a copy of which is attached to the Government's Response as Exhibit C, and it was admitted into evidence at the hearing as Government Exhibit 7.   Trooper Frew testified that defendant did not ask any questions of Trooper Erdely regarding the consent form.

Trooper Erdely verified that defendant previously had been informed of his <u>Miranda</u> rights.  Trooper Erdely testified that he asked defendant if he had a girlfriend who was 15 years old, and defendant responded that he did.   Trooper Erdely then asked defendant if he had any pictures of her on his computer, and defendant responded affirmatively.  At 11:16 a.m., defendant gave his fourth statement on a non-custodial written statement form, a copy of which is attached as Exhibit 7 to Defendant's Motion, and it was admitted into evidence at the hearing as Government Exhibit 8.  In that statement, he identified his former girlfriend as the person in the photos on his computer, and stated that she sent the photos to him.  After obtaining defendant's consent and statement, Trooper Erdely printed from defendant's computer photographs which

11

included those of defendant's former girlfriend.

Trooper Erdely testified that defendant never invoked his right to counsel, nor did he ask to stop the interview. Trooper Erdely spoke to defendant in a conversational tone, he did not threaten defendant, nor did he make any promises to defendant. According to Trooper Erdely, defendant appeared to have above average intelligence.

After meeting with Trooper Erdely and making the fourth written statement, defendant was escorted back to the conference room by Troopers Frew and Valyo. The troopers asked defendant if he had anything else he wanted to discuss. Defendant replied that he did not, and the troopers escorted him back to his parents so that he could leave the barracks.

Troopers Frew and Valyo testified that the January 31, 2006, interview with defendant was conducted in a conversational tone. According to both Trooper Frew and Trooper Valyo, defendant was attentive, cooperative, responsive and forthcoming, he appeared to be intelligent, and his descriptions of various events were logical and relevant to the investigation. In addition, defendant did not do anything to indicate that he was delusional, nor did he refer to having a mental condition or needing to take medication. Further, both troopers testified that defendant was not threatened or intimidated, he never complained of hunger or thirst during the interview, and his request for a cigarette break was granted.

12

AO 72
(Rev. 8/82)

Defendant testified that initially Troopers Frew and Valyo were a bit aggressive at the interview on January 31, 2006, but they did not yell at him. Defendant testified that after about ten minutes, overall the troopers were nice to him. Defendant indicated it was easier for him to write out the statements which he gave because he could not easily verbalize his answers as his thoughts were racing. According to defendant, Trooper Frew mentioned more than one time that he was doing the right thing by giving a statement. Defendant did not fear the troopers would physically harm him. Finally, defendant acknowledged that he knew he was not in custody during the January 31, 2006 interview.

After the interview was completed, defendant returned home. He later experienced suicidal and homicidal thoughts and asked his parents to take him to the hospital.

With regard to defendant's mental state, his mother, Kathy Carney, testified that defendant's psychological problems began in early high school. According to Mrs. Carney, defendant has been diagnosed with bipolar disorder, paranoid schizophrenia and depression, and he has taken psychotropic medications for a number of years.

Also with regard to defendant's mental state, on November 30, 2006, at a hearing in connection with pending state court proceedings, defendant's attorney introduced testimony from Dr. Steve Cartun, a psychiatrist who has treated defendant. Defendant

13

was admitted to the hospital on February 2, 2006, two days after he was interviewed at the state police barracks. He was under Dr. Cartun's care for depression, paranoid thoughts and auditory hallucinations.[3]  Dr. Cartun testified that defendant was not capable on January 31, 2006 of knowingly and voluntarily waiving his rights.  See State court hearing transcript, attached as Exhibit 2 to Defendant's Motion and admitted into evidence at the hearing as Defense Exhibit 7, at 24 ("[i]n my opinion there isn't any way [defendant] would have been able to cognitively process and understand the Miranda statement").  See also Dr. Cartun's letter report dated November 27, 2006, attached as Exhibit 8 to Defendant's Motion and admitted into evidence at the hearing as Defense Exhibit 8 ("Given [defendant's] mental state at the time of his admission, it was not possible for him to give a knowing and truly voluntary confession in the time period just two days prior to his admission.").

On January 24, 2007, in connection with the pending state court matter, defendant underwent a court ordered competency evaluation.   According to the state court's order, the Commonwealth was granted leave to employ Dr. Christine Martone to

---

[3]After defendant was discharged from the hospital on February 6, 2006, he was arrested and charged at the state level with multiple counts of arson, statutory sexual assault, corrupting the morals of a minor and possession of child pornography. Eventually, the matter was referred for federal prosecution as to the possession of child pornography matter.

14

perform a competency evaluation of defendant. <u>See</u> Defendant's Reply, Exhibit 1. Dr. Martone prepared a written report of her evaluation of defendant, which the government sought to have admitted into evidence at the suppression hearing. Defendant's counsel reiterated her objection to the admission of Dr. Martone's report, which objection previously was raised in Defendant's Reply. The court stated on the record at the hearing that it subsequently would rule whether Dr. Martone's report is admissible.

II.   **Defendant's Motion to Suppress Evidence and Statements (Document No. 47) and Motion to Suppress Evidence under Franks v. Delaware, Motion for Discovery of Encase Reports and Motion to Strike Dr. Christine Martone's Report and Preclude Her Testimony (Document No. 36)**

Defendant raises a variety of arguments why the evidence obtained from his computer depicting images of minors engaged in sexually explicit conduct, as well as his statements to law enforcement officers, should be suppressed. Each of defendant's arguments will be addressed in turn.

A.   **Whether the search warrant was supported by probable cause**

Defendant first argues that all evidence, and fruits of evidence, seized pursuant to the search warrant for defendant's home and computer and any statements by defendant should be suppressed because the search warrant solely was based on an uncorroborated, anonymous telephone tip in which the caller

15

asserted that defendant was the person responsible for setting fires in the Armagh area. According to defendant, suppression of the evidence is required because the search warrant was not supported by probable cause.

Whether probable cause exists is to be determined by a practical and common-sense approach. <u>Illinois v. Gates</u>, 462 U.S. 213 (1983). <u>Gates</u> provides that the inquiry is to be "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [the magistrate], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Id</u>. at 238. In <u>Massachusetts v. Upton</u>, 466 U.S. 727, 732-33 (1984), the Supreme Court emphasized that the reviewing court is not to conduct a "de novo probable cause determination" but is to decide merely "whether the evidence viewed as a whole provided a 'substantial basis' for the magistrate's finding of probable cause." Thus, the warrant is to be upheld as long as there is a "substantial basis" for a "fair probability" that specified evidence will be found in a particular place. <u>Id</u>. at 733. Although the magistrate's decision "should be paid great deference", <u>United States v. Harvey</u>, 2 F.3d 1318, 1322 (3d Cir. 1993), this "does not mean that reviewing courts should simply rubber stamp a magistrate's conclusions." <u>United States v. Tehfe</u>,

16

722 F.2d 1114, 1117 (3d Cir. 1983).

When a warrant affidavit includes an anonymous tip, <u>Gates</u> counsels that law enforcement must corroborate the tip to ensure the probable cause standard is met.  <u>See Gates</u>, 462 U.S. at 241 (noting that prior Supreme Court decisions have "consistently recognized the value of corroboration of details of an informant's tip by independent police work").

When considering a challenge to a search warrant, the court's review is confined to the contents of the affidavit of probable cause that was before the magistrate.  <u>United States v. Zimmerman</u>, 277 F.3d 426, 431, n.3 (3d Cir. 2002).  Here, the warrant affidavit, which was drafted by Trooper Frew, contained the following information relative to defendant:

- An anonymous call was received at the Indiana state police barracks in January 2006.  The caller stated that Kyle Carney was the person responsible for setting the recent fires in the Armagh area.

- Carney was interviewed by Trooper Frew and Trooper Valyo at his residence.  Carney denied any involvement in the fires.  Carney stated that he had been with James Foster when one of the fires took place.

- When the troopers interviewed Carney at his residence, they saw a computer in the entry way of his home and noticed that someone had been "chatting" online.

- Carney had posted a story on myspace.com relative to Trooper Frew interviewing him at his residence.

- Tim Benamati, who is the captain of the Armagh Fire Department which responded to one of the fires under investigation, received an e-mail from fire department member Rick Nerone.  In that e-mail, Nerone stated that he and others were being investigated by the state

17

AO 72
(Rev. 8/82)

police for involvement in the fires.

- • Trooper Frew stated that in his experience with computer related investigations, "persons can communicate with others over the internet and by the use of e-mail.... This officer believes that the computer systems of Nerone and Carney contain evidence that implicates them further in these crimes."

See warrant affidavit attached as Exhibit 1 to Defendant's Motion, a copy of which was admitted into evidence at the hearing as Government Exhibit 1.

It is true that an affidavit "should not be judged as an entry in an essay contest, but, rather, must be judged by the facts it contains." United States v. Harris, 403 U.S. 573, 579 (1971) (citation omitted). However, the warrant affidavit in this case is devoid of facts to link defendant or his computer to the fires that had been set. The only piece of information in the affidavit that connected defendant to the fires in the Armagh area was the anonymous telephone tip. However, the police failed to corroborate the anonymous telephone tip that defendant was involved in setting the fires, thus we know nothing about the anonymous caller's reliability, veracity or basis of knowledge. Furthermore, other than Trooper Frew's "belief", there is nothing in the affidavit to suggest that evidence of the fires would be found on defendant's computer.

Although the government insists the search warrant is supported by probable cause, it nonetheless acknowledges the affidavit's inadequacy by stating it did not "incorporate the

18

large body of incriminating evidence actually known to Trooper Frew...." Government's Response at 20. Trooper Frew himself testified at the hearing that he did not include in the warrant affidavit all of the information he knew concerning defendant's involvement in the fires. His testimony indicated it was a tactical choice not to include all of that information. While Trooper Frew may have decided for tactical reasons not to include in the affidavit everything that he knew about defendant's involvement in the fires, that does not excuse the inadequacy of the affidavit.

Faced with the fact that Trooper Frew did not include in the affidavit the "large body of incriminating evidence actually known to [him]," the government contends that Trooper Frew, nonetheless, "drafted a search warrant incorporating information that he had gleaned from several weeks of investigation, drawing connections between Carney, his computer and other suspects, Nerone and Foster...." Id. at 24. Despite the government's contention, a review of the warrant affidavit does not reveal that to be the case:

- The affidavit does not draw any connection between defendant and Nerone, another suspect in the investigation. The only connection between defendant and Foster was that the two were together when one of the fires took place. However, the affidavit does not implicate Foster in that fire.

- The affidavit mentions that defendant posted a story regarding his interview with the troopers on his myspace.com page, but it does not detail the content of

19

the posting.   Nonetheless, a review of the posting indicates that defendant denied involvement in the fires.   See Government's Response, Exhibit B.

- The affidavit mentions that Nerone sent an e-mail to the captain of the Armagh Volunteer Fire Department, stating that he and others were being investigated for involvement in the fires.  However, the affidavit does not allege any connection between that e-mail and defendant or his supposed involvement with the fires.

- The affidavit does not establish a connection between defendant and the computer located in the entry of his house.   A trooper observed that "someone" had been chatting online on the computer.  The affidavit does not indicate defendant was using the computer.  According to Trooper Frew's hearing testimony, the "someone" who had been using the computer was defendant's mother.

- The anonymous tip referenced in the affidavit did not suggest there was any information about the fires on defendant's computer.

- The only information in the affidavit that implicated defendant in the fires was the anonymous telephone tip. There is no indication in the affidavit that the troopers attempted to corroborate the anonymous tip.

The information in the warrant affidavit did not provide a substantial basis for the magistrate's finding of probable cause. Indeed, the only information linking defendant to the fires is the uncorroborated, anonymous telephone tip.  Perhaps in recognition of that fact, the government argues that the anonymous tip "merely served to focus the investigation and to foment contact with and investigation of Kyle Carney.  It was not submitted as the sum and substance of probable cause."  Government's Response at 26. Despite the government's contention that the anonymous tip "was not submitted as the sum and substance of probable cause", the

20

affidavit does not identify any other information linking defendant or his computer to the fires. In sum, there was not a "substantial basis" for a "fair probability" that evidence concerning the fires would be found on defendant's computer. Thus, probable cause is lacking in this case, and the evidence, and fruits of evidence, seized pursuant to the search warrant for defendant's home and computer and any statements defendant made to law enforcement officers must be suppressed unless there is any exception to the warrant requirement which applies.[4]

---

[4]Defendant also argues that, even assuming arguendo that probable cause existed to seize and search his computer, the evidence seized must be suppressed because the search of defendant's computer that uncovered child pornography exceeded the scope of the warrant. Defendant's argument on this point relates to the manner in which Trooper Erdely used the Encase software to conduct the forensic examination of his computer. See footnote 2, supra. In connection with this argument, defense counsel moved for discovery of Trooper Erdely's Encase report and log to determine exactly how he performed his search.

In light of the court's ruling that the search warrant was not based on probable cause, and the court's ultimate conclusion in this case that the evidence obtained from the search of defendant's computer and his statements must be suppressed, the court need not address defendant's alternative argument whether Trooper Erdely's search exceeded the scope of the warrant.

Further, regarding defense counsel's request for discovery of Trooper Erdely's Encase report and log, the government states in its response regarding selected issues (Document No. 45) that defendant was provided all written material that exists with respect to Trooper Erdely's forensic examination of defendant's computer. In addition, both counsel for the government and defense counsel previously met with Trooper Erdely and he described how he performed the examination of defendant's computer. Defense counsel did not raise this discovery issue at the suppression hearing, thus the court concludes that defense counsel was satisfied with Trooper Erdely's explanation. Accordingly, the court does not perceive any outstanding issue with respect to discovery of Trooper Erdely's Encase reports.

21

**B.   Whether the good faith exception applies**

According to the government, even if the court were to conclude that the search warrant was not based on probable cause, which the court has so concluded, the evidence should not be suppressed because the good faith exception to the exclusionary rule applies.   On the other hand, defendant asserts that the evidence seized and the fruit thereof must be suppressed because the circumstances of this case do not fall within the good faith exception.

In <u>United States v. Leon</u>, 468 U.S. 897 (1984), the Supreme Court established the good faith exception to the exclusionary rule and held that evidence should not be suppressed if it was obtained in objectively reasonable reliance on a subsequently invalidated search warrant.  <u>Id</u>. at 922.   While the <u>Leon</u> court affirmed that a warrant issued by a magistrate normally suffices to establish that an officer has acted in good faith in conducting the search, it emphasized that "the officer's reliance on the magistrate's probable cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable."   <u>Id</u>.

The test for whether the good faith exception applies is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." <u>Id</u>. at 923, n.23.  There are four situations in which an officer's

22

reliance on a warrant would not be reasonable and would not trigger the good faith exception: (1) when the magistrate issued the warrant in reliance on a deliberately or recklessly false affidavit; (2) when the magistrate abandoned his judicial role and failed to perform his neutral and detached function; (3) when the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) when the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized. Id. at 923; see also United States v. Hodge, 246 F.3d 301, 308 (3d Cir. 2001).

Here, the third situation is at issue: whether the warrant was based on an affidavit so lacking in indicia of probable cause as to render Trooper Frew's belief in its existence entirely unreasonable. Relevant to this inquiry is the fact that the objective standard adopted by the Leon court "requires officers to have a reasonable knowledge of what the law prohibits." Leon, 468 U.S. at 919, n.20.

The government concedes, as already stated above, that Trooper Frew "could have and should have included more direct evidence that he and Trooper Valyo had gathered in the course of their investigation", but nevertheless maintains that Trooper Frew "assembled a summary of his evidence and allowed a judge to determine whether his evidence was sufficient." See Government's

23

Response at 24.  The government asserts that it was not entirely unreasonable for Trooper Frew to believe that there was probable cause that evidence of a crime existed on defendant's computer because:

> [i]t was clear that a crime had been committed, and that the possible suspects were using the computer to communicate.  Carney posted very public and detailed statements regarding his police contact after the interview, and the implication was that Nerone and Carney must have communicated about the fact of the investigation into the recent fires.

Id.  Thus, according to the government, a reasonable officer could believe that enough information was included in the warrant affidavit to establish a fair probability that evidence of arson would be found on defendant's computer.

Defendant's position is that any reasonable officer would have realized that an uncorroborated, anonymous telephone tip cannot provide probable cause for a search warrant.  Defendant cites to numerous federal court decisions which have held that the need to corroborate an anonymous tip with independent police work is so well-established that the failure to do so falls below the standard for the Leon exception to apply.  See e.g., United States v. Helton, 314 F.3d 812 (6th Cir. 2003) (reasonable officer, as affiant applying for search warrant, would not have believed that anonymous tipster's statements were trustworthy and reliable, consequently, good faith exception to exclusionary rule did not apply); United States v. Wilhelm, 80 F.3d 116, 120 (4th Cir. 1996)

24

(search warrant which was based on affidavit providing information from anonymous informant was not supported by probable cause where affidavit provided no indication of informant's truthfulness or reliability other than officer's conclusory description of informant as "concerned citizen" and "mature person" and police only corroborated that directions which informant gave to defendant's home were correct); United States v. Barrington, 806 F.2d 529, 532 (5th Cir. 1986) (probable cause affidavit which stated that police officer received information from confidential informant who was known to officer and who had provided information in past leading to arrest and convictions, did not justify police officer's good-faith reliance on warrant in his search of hotel room).

As acknowledged by the government, Trooper Frew, who drafted the warrant affidavit, "could have and should have included more direct evidence that he and Trooper Valyo had gathered in the course of their investigation." As it was, the only information in the warrant affidavit to link defendant to the arsons in the Armagh area was the uncorroborated, anonymous telephone tip. Beyond that, there was no information in the affidavit to connect defendant or his computer to the arsons.

As the cases cited above indicate, the necessity of corroborating an anonymous tip with independent police work is so well-established that the failure to do so falls below the

25

standard for the good faith exception to apply.  See also United States v. Ritter, 416 F.3d 256, 263 (3d Cir. 2005) (stating "[w]here corroboration or independent investigation after receipt of an anonymous tip is lacking - and thus the predictive value of the tip goes untested before a warrant is issued - courts have found officers' subsequent reliance on the warrant unreasonable"). A reasonably well-trained officer would have recognized the need for corroboration of the anonymous tip and that the failure to do so rendered the affidavit that was presented to the magistrate in this case insufficient.  Moreover, where, as here, the affiant is also one of the executing officers, "it is somewhat disingenuous, after having gone to the magistrate with the paltry showing seen here, to suggest ... that at bottom it was the magistrate who made the error and the search and seizure are insulated because the officer's reliance on that error was objectively reasonable." Zimmerman, 277 F.3d at 438.

No objectively reasonable police officer could believe that, despite the district justice's authorization, the anonymous tip provided probable cause to seize and search defendant's computer. Thus, the good faith exception to the exclusionary rule does not apply in this case, which is an additional basis for suppression of the evidence obtained from the search of defendant's computer and the fruit thereof.

26

**C.   Whether defendant's consent to search and whether his Miranda waiver and statements were voluntary, and, if so, whether defendant's consent and Miranda waiver attenuated or purged the taint of the prior Fourth Amendment violation**

Although the search warrant was not based on probable cause and cannot be saved by the good faith exception to the exclusionary rule, the government next asserts that the court should deem the products of the consent search conduct by Trooper Erdely admissible because defendant's consent purged any taint of the prior Fourth Amendment violation.  According to defendant, the after-the-fact consent to search his computer for child pornography did not dispel the taint of the prior Fourth Amendment violation, it was the fruit of the unlawful search and it was not voluntary.  Defendant further contends that the statements he made during the interview on January 31, 2006, at the state police barracks must be suppressed because they were the fruit of the unlawful search of his residence and his computer, and his alleged Miranda waiver and statements were not voluntary.

The exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or "fruit of the poisonous tree."  Segura v. United States, 468 U.S. 796, 804 (1984).  Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion.  The question to be resolved when it is claimed that evidence subsequently obtained is "tainted" or is "fruit" of a

27

prior illegality is whether the challenged evidence was "come at by exploitation of [the initial] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Wong Sun v. United States, 371 U.S. 471, 488 (1963). It is well-established that evidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the challenged evidence has "become so attenuated as to dissipate the taint." Id. at 487 (quoting Nardone v. United States, 308 U.S. 338, 341 (1939)).

### 1. Consent to search and Miranda waiver

Before analyzing whether the images of child pornography which Trooper Erdely discovered after searching defendant's computer and whether defendant's statements to Erdely concerning the child pornography are fruit of the poisonous tree, the court must first consider whether defendant voluntarily consented to the search and waived his Miranda rights.

A defendant's consent to a search and his waiver of Miranda rights must be obtained validly in order for the evidence obtained thereafter to be admissible. Consent to a search is valid if it is voluntary - if under the totality of the circumstances it is free from explicit or implicit police coercion. Schneckloth v. Bustamonte, 412 U.S. 218, 228-29 (1973). Further, a defendant who has been advised of, but has not yet invoked, his Miranda rights may waive them - provided he does so knowingly, intelligently, and

28

voluntarily, given the totality of the circumstances.  See Moran
v. Burbine, 475 U.S. 412, 422-23 (1986).

Statements not obtained in violation of a person's Miranda
rights are nonetheless subject to suppression as violative of due
process if the statements are coerced or involuntary.  Arizona v.
Fulminante, 499 U.S. 279, 288 (1991).  A statement is coerced or
involuntary if the behavior of "... law enforcement officials was
such as to overbear [the defendant's] will to resist and bring
about confessions not freely self-determined...."  Rogers v.
Richmond, 365 U.S. 534, 544 (1961).[5]  To determine whether a
defendant's will was overborne, the totality of the circumstances
analysis includes consideration of the accused's characteristics
and the details of the interrogation such as: the youth of the
accused; his lack of education or low intelligence; the lack of
any advice to the accused of his constitutional rights; the length
of detention; the repeated and prolonged nature of questioning;
and the use of physical punishment such as the deprivation of food
or sleep.  Id. at 226.

---

[5]It is the government's burden to prove the Miranda waiver by
a preponderance of the evidence, Colorado v. Connelly, 479 U.S.
157, 168 (1986), as well as to show by a preponderance of the
evidence that the challenged statements are voluntary.  Lego v.
Twomey, 404 U.S. 477, 489 (1972).

AO 72
(Rev. 8/82)

Here, defendant claims his consent,[6] <u>Miranda</u> waiver[7] and statements[8] were not voluntary. Defendant argues that his alleged consent, waiver and statements were obtained by exploitation of the prior illegality of seizing evidence based upon a search warrant lacking in probable cause. Defendant states the troopers confronted him with the fact that they had obtained an image of child pornography from his computer prior to seeking his consent to search the very computer which they had already searched, and

---

[6]The consent to search form executed by defendant is attached as Exhibit D to the Government's Response, and it was admitted in evidence at the hearing as Government Exhibit 6. That form indicates defendant gave consent for his computer to be searched for evidence of child pornography.

[7]Defendant executed a Pennsylvania State Police Rights Warning and Waiver form, which was admitted in evidence at the hearing as Government Exhibit 2. By executing the form, defendant affirmed that he understood his rights and was willing to answer questions, that he did not want an attorney, and that no threats or promises were made to him. In addition, the third of defendant's four written statements, which related to the arson investigation, is set forth on a custodial written statement form, and contains a written waiver of <u>Miranda</u> rights. That form is attached to Defendant's Motion as Exhibit 5, and it was admitted in evidence at the hearing as Government Exhibit 5. Trooper Erdely also testified that when he met with defendant concerning his discovery of an image of child pornography, the trooper verified that he previously had been informed of his <u>Miranda</u> rights.

[8]Defendant's fourth written statement, set forth on a non-custodial written statement form, relates to the images of child pornography found on his computer. That form is attached to Defendant's Motion as Exhibit 7, and it was admitted in evidence at the hearing as Government Exhibit 8. According to Trooper Erdely's hearing testimony, defendant also made oral statements to him concerning the existence on his computer of pictures of his minor ex-girlfriend.

30

obtaining a statement from him.  Further, defendant argues the troopers' assertion that they had already searched the computer pursuant to a valid warrant rendered his alleged consent to search the computer involuntary.  According to defendant, in light of that representation, he was justified in believing that refusing to consent would be futile, thus his consent cannot be deemed voluntary.

With respect to the _Miranda_ waiver, defendant contends the totality of the circumstances indicates that waiver was not voluntary.  Defendant states he had just turned twenty, he had no prior experience with the criminal justice system, he had been under psychiatric care in the past, and he was admitted to the hospital for psychiatric problems two days after the interview on January 31, 2006.  Further, defendant claims that the troopers were aware that he suffered from a mental disorder and that he took psychiatric medication, but they knew he did not have the medication with him when he was interviewed.  Defendant's position is that these factors render his _Miranda_ waiver, as well as his consent to search and his statement, involuntary.

Defendant also claims that he was subject to a coercive atmosphere when he gave his consent and made a statement.  According to defendant, the troopers told him he did not need a lawyer, they yelled at him and berated him, and they downplayed the seriousness of the discovery of the images of child

31

pornography.  In addition, defendant claims that he was in custody when he gave his consent to search the computer and made incriminating statements.  Although he arrived at the police station on his own at the troopers' request, and initially was told he was free to leave, he then was confronted with serious accusations of arson and later that child pornography was on his computer.  This conveyed to him the impression that he was not free to leave.

The court disagrees with defendant's contention that his consent to search and Miranda waiver were involuntary, and that he was subject to a coercive atmosphere when he gave his consent and made a statement.  The court is cognizant of the fact that defendant was admitted to the hospital on February 2, 2006, two days after he was interviewed at the state police barracks, and he was under the care of Dr. Cartun for depression, paranoid thoughts and auditory hallucinations.  The court also is aware that Dr. Cartun testified in a pending state court proceeding involving defendant that he was not capable on January 31, 2006 of knowingly and voluntarily waiving his rights.  See State court hearing transcript, attached as Exhibit 2 to Defendant's Motion, at 24. Despite Dr. Cartun's after-the-fact opinion, the evidence adduced at the hearing in this case indicates a contrary conclusion as to both defendant's Miranda waiver and his consent to search.

First, with respect to defendant's Miranda waiver, he

32

executed the Pennsylvania State Police Rights Warning and Waiver form at the beginning of the interview on January 31, 2006.  The form contained a written <u>Miranda</u> warning, which advised defendant of his rights.  Defendant signed the waiver portion of the form, indicating that he understood his rights, did not want an attorney and was willing to answer questions.  Trooper Frew testified that defendant did not show any hesitancy about executing the waiver, and both Troopers Frew and Valyo testified that defendant did not ask any questions about the form or indicate that he wished to have counsel.

In addition, the three non-custodial written statement forms, which defendant completed and signed, indicates his acknowledgment that he was not in custody and that he decided of his own free will to answer questions.  Although defendant also made one statement on a custodial written statement form, he was advised that he still was not in custody.  The custodial written statement form was used, according to Trooper Frew, because it contained a printed advice of <u>Miranda</u> rights, and the troopers wanted to make sure defendant still was aware of his rights because of the length of time of the interview.  By signing that form, defendant acknowledged that he understood his rights, but wished to make a statement.

Defendant also voluntarily provided written consent for Trooper Erdely to search his computer for child pornography.

33

Defendant executed a waiver of rights and consent to search form, on which he acknowledged that no one threatened him in any way, nor had any promises been made to him in return for him giving consent to search.

The various forms executed by defendant indicate that he voluntarily waived his <u>Miranda</u> rights and that he voluntarily consented to have his computer searched for child pornography. In addition, the troopers' testimony further confirms the fact that defendant's <u>Miranda</u> waiver and consent were voluntary. According to both Troopers Frew and Valyo, defendant was attentive, cooperative, responsive and forthcoming, he appeared to be intelligent, and his descriptions of various events were logical and relevant to the investigation. In addition, defendant did not do anything to indicate that he was delusional, nor did he refer to having a mental condition or needing to take medication. Trooper Erdely also testified that defendant appeared to have above average intelligence, and he was unaware that defendant had any mental health condition.

Moreover, testimony by all three troopers indicate defendant was not subject to a coercive atmosphere when he was interviewed. Troopers Frew and Valyo testified that the January 31, 2006, interview with defendant was conducted in a conversational tone. Further, both troopers testified that defendant was not threatened or intimidated, he never complained of hunger or thirst during the

34

interview, and his request for a cigarette break was granted.  In addition, Trooper Erdely testified that defendant never invoked his right to counsel, nor did he ask to stop the interview. Trooper Erdely spoke to defendant in a conversational tone, he did not threaten defendant, nor did he make any promises to defendant.

Defendant testified that initially Troopers Frew and Valyo were a bit aggressive at the interview on January 31, 2006, but they did not yell at him.  Defendant testified that after about ten minutes, overall the troopers were nice to him.  Defendant did not fear the troopers would physically harm him.  Despite his contention in his written filing that he had the impression he was not free to leave the interview, defendant acknowledged at the hearing that he knew he was not in custody during the January 31, 2006 interview.  In light of defendant's own testimony, as well as the testimony of the three troopers, the court finds that defendant was not subject to a coercive atmosphere when he was interviewed and that he voluntarily waived his <u>Miranda</u> rights and provided consent to Trooper Erdely to search his computer for evidence of child pornography.

### 2. Attenuation of the taint

Although the court has found that defendant's consent and <u>Miranda</u> waiver were voluntary, the prior Fourth Amendment violation issue remains.  Defendant's position is that his consent, <u>Miranda</u> waiver and statements were obtained by

35

exploitation of the prior illegality of seizing evidence based upon a search warrant lacking in probable cause.  The court agrees with defendant.

After a prior Fourth Amendment violation (such as the seizure of property and subsequent search pursuant to a warrant lacking in probable cause in this case), consent and _Miranda_ warnings are not per se sufficient to remove the taint of the primary illegality. _See_ _Brown v. Illinois_, 422 U.S. 590, 603 (1975).  Even if a defendant has validly waived his _Miranda_ rights and voluntarily consented to a search, the government still bears the burden of proving that such waiver or consent was an independent act of free will that broke the causal connection between the prior illegality of the Fourth Amendment violation and the proffered evidence.  _Id._ at 604.  _Wong Sun_ requires that the consent or waiver be "sufficiently an act of free will to purge the primary taint." _Wong Sun_, 371 U.S. at 486.  Factors indicating a defendant's _Miranda_ waiver or consent to a subsequent search were independent acts of free will sufficient to break the causal chain of the Fourth Amendment violation include: (1) the temporal proximity of the illegal conduct and the waiver or consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct.  _Brown_, 422 U.S. at 603-04.

According to the government, the court should deem the products of the consent search conducted by Trooper Erdely

36

admissible because defendant's consent purged any taint of the prior illegality that may have resulted from the search based on the questioned warrant.   The government argues that there was temporal attenuation because the search warrant was executed on January 30, 2006, at defendant's residence and Trooper Erdely obtained defendant's consent the next day.[9]   The government maintains there was no exploitation of the search because Erdely did not draft the warrant affidavit, he was not involved in the arson investigation and he had not reviewed the affidavit before examining defendant's computer.   The government also claims there was subject matter attenuation because when Erdely noticed an image of child pornography, he immediately stopped his examination of defendant's computer and obtained defendant's written consent to search for child pornography.   The government insists Trooper Erdely was "motivated to obtain consent, not to exploit any possible illegality in the original search, but to legitimate a search that was outside the original confines dictated by the warrant."   Government's Response at 34.   Thus, the government asserts, even if the original search of defendant's residence was illegal, Trooper Erdely's conduct attenuated the taint from that

---

[9]Note, however, that there was no temporal attenuation between the initial search of defendant's computer conducted by Trooper Erdely on January 31, 2006, when he used the Encase program to create thumbnail images of the contents of the computer, and Erdely's subsequent request that same day that defendant consent to a search of his computer for child pornography.

37

✎AO 72
(Rev. 8/82)

search, and the child pornography evidence is therefore admissible.

The court disagrees with the government's position, and finds that the taint from the unlawful seizure of defendant's computer and subsequent search of it pursuant to an invalid warrant was not attenuated by the fact that Trooper Erdely subsequently obtained defendant's consent to search his computer for child pornography. Defendant could not retroactively consent to the unlawful seizure of his computer pursuant to an invalid warrant which was executed the day before the computer was searched. Furthermore, after Trooper Erdely noticed an image of suspected child pornography on defendant's computer, he sought defendant's consent to search the computer for additional child pornography. No significant time elapsed between Trooper Erdely's unlawful search of defendant's computer pursuant to the invalid warrant and his solicitation of defendant's consent to search for images of child pornography and defendant's statements concerning the existence of such images on his computer. In addition, no intervening event of any significance occurred between Trooper Erdely's search of the computer pursuant to the invalid warrant and the time he sought defendant's consent which would serve to attenuate the taint of the prior Fourth Amendment violation.

In sum, defendant's consent to search his computer for additional evidence of child pornography came _after_ and _as a_

38

result of the unlawful seizure and search of that computer.   In short, it was the fruit of the unlawful search.   It would be ironic and contrary to long-established law, if the consent were now found to purge the taint of the prior Fourth Amendment violation.   Thus, the images of child pornography obtained from defendant's computer must be suppressed for this reason, as well as those previously stated above.

In addition, the fact that defendant was given <u>Miranda</u> warnings in connection with the arson investigation after the computer was seized pursuant to the invalid warrant does not purge the taint.   Less than twenty-four hours passed between the illegal seizure of the computer and defendant's <u>Miranda</u> waiver and no intervening circumstance of any significance occurred to attenuate the taint of the prior unlawful seizure.   Therefore, defendant's statements, whether written or oral, concerning the child pornography on his computer were the fruit of the prior Fourth Amendment violation and must be suppressed.

### D.  <u>Whether the warrant affidavit contained material omissions</u>

Defendant argues that the warrant affidavit contained material omissions, which constitute false statements under <u>Franks v. Delaware</u>.[10]   Defendant's position is that the affidavit failed

---

[10]According to defendant, the government's response indicates there were three material omissions in the affidavit: (1) defendant's mother actually was the "someone" who had been chatting on the computer that Trooper Frew observed in the entry

39

to establish probable cause, even with the material omissions.

The rule governing situations involving allegedly misleading search warrant affidavits was articulated by the Supreme Court in Franks v. Delaware, 438 U.S. 154 (1978). The Franks court created a mechanism to allow a defendant to overcome the general presumption that an affidavit of probable cause supporting a search warrant is valid. First, the defendant must make a substantial preliminary showing that the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, and which is material to the finding of probable cause. Franks, 438 U.S. at 171. At a Franks hearing, the defendant must ultimately prove by a preponderance of the evidence: (1) that the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary, to the probable cause determination. Id. at 171-72.

In order to make the substantial preliminary showing, the

---

of his home; (2) the lengthy story which defendant posted on his myspace.com page following the interview with the troopers at his residence was not attached to the warrant affidavit, but a review of that story indicates that defendant denied knowing anything about the fires; and (3) the affidavit states that Nerone e-mailed the fire chief that he and others were being investigated in connection with the fires, but it does not disclose that Nerone denied involvement in the fires in that e-mail, as well as the fact that he accounted for his whereabouts and said he was with defendant. See Defendant's Reply at 11-13.

40

defendant cannot rest on mere conclusory allegations or a "mere desire to cross-examine," but rather must present an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses. Id. at 171.

In light of the foregoing, defendant is not entitled to relief under Franks. While defendant alleges that Trooper Frew knowingly omitted material information from the warrant affidavit, contrary to Franks, that allegation is not accompanied by an offer of proof or any sworn statements of witnesses in support of the assertion that Trooper Frew knowingly omitted material information. Although Trooper Frew testified that he did not include in the warrant affidavit all of the information he knew concerning defendant's involvement in the arsons, there is no evidence that Trooper Frew knowingly or with reckless disregard for the truth omitted material information. His testimony indicated it was a tactical decision to draft the warrant affidavit as he did.

Although defendant is not entitled to relief under Franks, that determination does not in any way alter the court's ultimate conclusion that the evidence relating to images of child pornography seized from defendant's computer and his statements, whether written or oral, concerning the existence of child pornography on his computer, must be suppressed for all of the

41

✎AO 72
(Rev. 8/82)

reasons stated in parts II. A, B and C of this opinion, <u>supra</u>.

### E. Motion to strike Dr. Christine Martone's report and preclude her testimony at the suppression hearing

On January 24, 2007, in connection with a pending state court matter, defendant underwent a court ordered competency evaluation. According to the state court's order, the Commonwealth was granted leave to employ Dr. Christine Martone to perform a competency evaluation of defendant. <u>See</u> Defendant's Reply, Exhibit 1. Dr. Martone prepared a written report of her evaluation of defendant, which the government attached as a sealed exhibit to its Response, and also sought to have admitted at the suppression hearing in the instant case.[11] Defendant's counsel reiterated her objection at the hearing to the admission of Dr. Martone's report, which objection originally was raised in Defendant's Reply. The court stated on the record at the hearing that it subsequently would rule whether Dr. Martone's report is admissible.

According to Dr. Martone's report, defendant was "referred by the District Attorney, requesting an evaluation of competency issues, including competency to stand trial and competency at the time the defendant waived his <u>Miranda</u> warnings and gave his statement to the police." Dr. Martone ultimately concluded in her report that defendant was competent to stand trial, and that his statements to the troopers were intelligent and knowing.

---

[11]The government only sought to introduce Dr. Martone's report at the suppression hearing, not to offer her live testimony.

42

AO 72
(Rev. 8/82)

Defendant argues that the government should not be permitted to rely upon the compelled interview of defendant conducted by Dr. Martone because that interview was not authorized by state or federal law, and its use in this case would violate defendant's rights under the Fifth and Sixth Amendments.   According to defendant, in addition to being evaluated for the proper purpose of competency to stand trial as ordered by the state court, he was interrogated by a psychiatrist acting on behalf of the Commonwealth on a suppression issue being litigated in state and federal court.   Defendant asserts that Dr. Martone's report is not admissible on the suppression issue in this case.

The Third Circuit has held that "use at trial of statements exacted by the compulsion of a court ordered psychiatric examination, at least where any statement elicited in the examination tends to establish the fact of the offense or the voluntariness of other statements by the accused, is a violation of the privilege against self-incrimination." United States v. Alvarez, 519 F.2d 1036, 1042 (3d Cir. 1975) (emphasis added). Furthermore, "[a] compelled psychiatric interview implicates Fifth and Sixth Amendment rights.   Before submitting to that examination, the defendant must receive Miranda warnings and (once the Sixth Amendment attaches) counsel must be notified.[12]   The

---

[12]Defendant states that when he was evaluated by Dr. Martone on January 24, 2007, the right to counsel had attached in the instant federal case, however, his counsel was not notified that

43

warnings must advise the defendant of the 'consequences of foregoing' his right to remain silent." <u>Gibbs v. Frank</u>, 387 F.3d 268, 274 (3d Cir. 2004) (citation omitted).

Here, there is no indication that defendant was provided with these required warnings. Accordingly, Dr. Martone's report, to the extent that she renders an opinion on the voluntariness of his <u>Miranda</u> waiver, is inadmissible.

### III. <u>Defendant's Motion to Produce Evidence which the Government Intends to Use Under Fed.R.Evid. 404(b) and 609 (Document No. 32)</u>

Defendant seeks an order compelling the government to provide him with a statement of the nature, dates and places of occurrences of any criminal offenses or acts of misconduct other than those set forth in the indictment which the government will attempt to prove at trial pursuant to Fed.R.Evid. 404(b) and/or evidence of any prior convictions pursuant to Rule 609. Defendant also requests a pretrial hearing to determine the admissibility of any evidence the government intends to offer under Rule 404(b).

According to the Government's Response at 35, discovery has been provided to defendant, but the government has not yet identified the specific other acts by defendant that it may seek to introduce at trial. The government states it is aware of the notice requirement under Rule 404(b), and it will provide the

---

the evaluation was taking place, in violation of his Sixth Amendment rights.

44

required notice at least ten days before trial.  According to the commentary to Rule 404(b), other than requiring pretrial notice, no specific time limits are stated in recognition that what constitutes reasonable notice will depend on the circumstances of each case.   Courts that have considered what constitutes "reasonable notice" have concluded that notice of intent to use Rule 404(b) evidence seven to ten days prior to trial is sufficient.  <u>See</u> <u>United States v. Evangelista</u>, 813 F.Supp. 294, 302 (D.N.J. 1993) (ten days); <u>United States v. Alex</u>, 791 F.Supp. 723, 728-29 (N.D.Ill. 1992) (seven days); <u>United States v. Williams</u>, 792 F.Supp. 1120, 1133 (S.D.Ind. 1992) (ten days). Thus, the government's statement that it intends to provide notice under Rule 404(b) at least ten days prior to trial is consistent with the case law interpreting the rule, and an order will be entered to that effect.

Regarding defendant's request for a pretrial hearing on the admissibility of Rule 404(b) evidence, that request will be denied.   It is preferable to resolve Rule 404(b) objections in conjunction with the factual context of the case.   <u>See</u> <u>United States v. Giampa</u>, 904 F.Supp. 235, 284 (D.N.J. 1995) ("Generally, objections as to the admissibility of prior bad acts under Rule 404(b) are properly asserted during trial, not at the pretrial stage.").

As for defendant's request under Rule 609, the government

45

states defendant does not presently appear to have any prior convictions that would qualify for admission under that rule. However, if defendant testifies at trial, the government will seek to impeach him with any admissible convictions under Rule 609 that exist at the time of his testimony.

## IV.   **Conclusion**

For the foregoing reasons, defendant's motion to suppress evidence and statements will be granted, his request for discovery of Encase reports will be denied, his motion to suppress evidence under Franks v. Delaware will be denied, his motion to preclude Dr. Martone's report will be granted, and his motion for the production of evidence under Fed.R.Evid. 404(b) and 609 will be denied, all as set forth herein.

An appropriate order will follow.

Gustave Diamond
United States District Judge

Date: June 27, 2007

46

AO 72
(Rev. 8/82)